# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATALIE STROUP,<br><br>                              Plaintiff,<br><br>     vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.; EQUIFAX INFORMATION SERVICES, LLC; TRANS UNION, LLC; VERIZON COMMUNICATIONS INC.<br><br>                              Defendants. | Civil Action No.: _1:22-cv-71_____<br><br><br>COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Natalie Stroup ("Plaintiff" or "Natalie"), through counsel, brings this action against defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("TransUnion") (collectively, "CRA Defendants"), and Verizon Communications Inc. ("Verizon") (all defendants collectively, "Defendants") and alleges based upon Plaintiff's personal knowledge, the investigation of counsel, and information and belief, as follows:

## NATURE OF THE ACTION

1.      Plaintiff's Complaint arises from Defendants' violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*  Plaintiff contends that CRA Defendants each violated 15 U.S.C. §1681e(b) in failing to maintain and follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2.      Plaintiff's Complaint also alleges that CRA Defendants each violated 15 U.S.C. §1681i in failing to reasonably reinvestigate Plaintiff's consumer disputes, which each resulted in Defendants' reporting inaccurate information about Plaintiff.

3.      Plaintiff's Complaint also alleges that Verizon violated 15 U.S.C. §1681s-2(b) in failing to conduct a reasonable investigation after receiving notice of Plaintiff's disputes from Equifax, TransUnion, and Experian.

## JURISDICTION AND VENUE

4.      The claims asserted in this complaint arise under 15 U.S.C. §§1681e, 1681i, and 1681s-2(b) of the FCRA.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and 15 U.S.C. §1681p.

5.      Venue is proper in this judicial district under 28 U.S.C. §1391(b).

## PARTIES

6.      Plaintiff resides in Erie County, Pennsylvania, and qualifies as a "consumer" as that term is defined under 15 U.S.C. §1681a(c).  Plaintiff is an individual.

7.      Defendant Equifax regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is a Georgia corporation that regularly conducts business in this judicial district. Equifax maintains a principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Equifax maintains a principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Equifax can be served through its registered agent,

Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

8.      Defendant Experian regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is an Ohio corporation that regularly conducts business in this judicial district. Experian maintains a principal place of business, and can be served, at 475 Anton Boulevard, Costa Mesa, CA 92626.

9.      Defendant TransUnion regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, TransUnion is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). TransUnion is a Delaware corporation that regularly conducts business in this judicial district. TransUnion maintains a principal place of business at 555 West Adams Street, Chicago, IL 60661 and can be served through its registered agent, Prentice Hall Corporation, 801 Adlai Stevenson Drive, Springfield, IL 62703.

10.     Defendant Verizon regularly provides consumer credit information to consumer reporting agencies. Therefore, Verizon is "furnisher" of consumer credit information as that term is contemplated by 15 U.S.C § 1681s-2. Verizon is a Delaware corporation that regularly conducts business in this judicial district.  Verizon maintains a principal place of business at 1095 Avenue of the Americas, New York, New York. Verizon can be served through its registered agent, CT Corporation System, 28 Liberty Street, New York, NY 10005.

11.     During all times pertinent to this Complaint, each defendant was authorized to conduct business in the State of Pennsylvania and conducted business in the State of Pennsylvania on a routine and systematic basis.

12.     During all times pertinent to this Complaint, each defendant acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

13.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and CRA Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## FACTUAL ALLEGATIONS

### A.  The FCRA and Credit Reporting

14.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

15.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

16.     Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

17.     The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

4

18.    CRA Defendants are the three major consumer reporting agencies, or credit bureaus, in the United States that regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports (also known as credit reports).

19.    The CRA Defendants' consumer reports generally contain the following information: (i) <u>Header/Identifying Information</u>: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

20.    The CRA Defendants obtain consumer information from various sources. Some consumer information is sent directly to CRA Defendants by furnishers, and other information is independently gathered by CRA Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

21.    The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from consumer reporting agencies (like CRA Defendants) to make lending decisions.

22.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in

a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's consumer reports.

23.     The information CRA Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

24.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

25.     Defendants know that a consumer report indicating an account delinquency negatively impacts a consumer's credit score and/or FICO Score.

26.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, CRA Defendants frequently report information regarding credit tradelines based on incomplete or knowingly inaccurate information.

27.     CRA Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, related to whether an account's debt has been fully paid.

28.     CRA Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b), despite possessing information inconsistent with the reported information, and information that establishes that the reported information is inaccurate.

29.     CRA Defendants' unreasonable policies and procedures cause them to regularly report consumer information without verifying its accuracy.

30.     CRA Defendants are on continued notice of their inadequate reporting procedures, including pertaining to inaccurate account and payment statuses and failing to verify the status of accounts even after notice from the consumer, through the thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints filed against them for their inaccurate reporting.

**B. The Verizon Debt and Account**

31.     Plaintiff resides in Erie County, Pennsylvania with her husband, a U.S. military veteran, as well as her youngest son, who is a current U.S. servicemember.

32.     At one time, Plaintiff was a subscriber to Verizon's home internet service. However, Plaintiff was not satisfied with Verizon's internet service. Plaintiff was paying a premium of approximately $70 dollars each month for internet that was spotty, slow, and inconvenient.

33.     Therefore, in or around February 2021, Plaintiff called Verizon to cancel her internet subscription. Upon information and belief, Verizon resistant Plaintiff's clear instruction to cancel her subscription. Instead, Verizon sent to Plaintiff an invoice requesting payment for her monthly home internet subscription.

34.     Plaintiff had procured a different internet service provider and was no longer using Verizon's internet service.

35.     The next month, in or around March 2021, the same incident recurred. Plaintiff, once again, demanded that Verizon discontinue its service and cease billing her for its internet. Upon information and belief, Verizon continued its resistance to Plaintiff's clear instruction to cancel her subscription and again charged Plaintiff for its purported internet service subscription.

36.     Because Plaintiff feared that non-payment of Verizon's invoice may result in adverse credit consequences if such non-payment was reflected on her consumer reports, Plaintiff timely paid Verizon's invoice.

37.     In the ensuing months, Plaintiff did not receive further invoices from Verizon, and Plaintiff assumed that Version has finally cancelled her internet subscription.

38.     On or about May 5, 2021, Plaintiff suddenly received an invoice from Verizon for a purported outstanding Verizon debt (the "Verizon Debt") in the amount of $104.00 dollars (Account No. 4552757700***).

39.     Plaintiff knew that she was not liable for any further payment to Verizon, and assumed the outstanding balance was in error. Plaintiff planned to deal with the error in the coming weeks.

40.     In the interim, Plaintiff resumed her grueling daily schedule that consisted of working long hours as an optician and optometric technician in two Veterans Affairs healthcare facilities located over an hour's drive from her home.

41.     The location of the Veterans Affairs facilities at which Plaintiff worked necessitated that Plaintiff drive almost three hours daily. Additionally, Plaintiff's car had, at that time, already incurred approximately 65,000 miles. As such, Plaintiff was actively preparing her credit profile and credit score that would allow her to qualify for a trade-in or car loan refinancing

42.     While Plaintiff maintained a strong credit profile regardless, she was especially attuned to her credit score and credit standing, and, to that end, had procured various credit services that closely monitored her credit score and profile.

43.     In or around July of 2021, Plaintiff suddenly received a notification from a credit score tracking service that her credit score had been reduced.

44.     Plaintiff immediately became aware that the Verizon account (opened in June 2017, Account No. 455275XXXXX) (the "Verizon Account") had been reported as placed in collections.

45.     On the same day, Plaintiff paid $104.00 dollars of the Verizon Debt.

46.     Also on the same day, Plaintiff called Verizon to have the reporting concerning any delinquency on the Verizon Account corrected and removed, to no avail.

47.     Plaintiff had always maintained a strong credit profile and was aghast at the prospect of incurring a charge-off that would send her debt to a collection company and had the potential of destroying Plaintiff's credit standing and ability.

48.     Despite her payment of the $104.00 dollars, in or around July of 2021, Plaintiff began receiving further letters and phone calls relating to the Verizon Debt. Each demanded payment.

49.     In the subsequent days and weeks, including on August 6, 2021, Plaintiff tried further communicating with Verizon concerning the Verizon Account and Verizon Debt.

50.     After many frustrating and agonizing calls to Verizon, including to Verizon's Billing Department, Verizon's Recovery Department, Verizon's Customer Service, and others, Plaintiff was finally informed that her account had incurred additional charges and fees and that – despite her payment of $104.00 dollars – she still owed funds to Verizon.  Further, Plaintiff was informed that she must await a "final bill" to know how much she still owed.

51.     On or about September 27, 2021, Plaintiff finally received a "final bill" from Verizon; the bill indicated that Plaintiff still owed an outstanding $112 dollars and 12 cents.

52.    In or around mid-September, 2021, Plaintiff finally received a "final bill" from Verizon that displayed a "Bill Date" of August 27, 2021. The bill indicated that Plaintiff still owed an outstanding $112 dollars and 12 cents.

53.    Therefore, on or about September 20, 2021, Plaintiff initiated a payment that fully and completely paid off her Verizon Debt.

**C. Defendants' Inaccurate Reporting Caused Harm**

54.    However, Plaintiff adduced from her credit monitoring services as well as an Experian phone application that the Verizon Account was still being reported as delinquent, notwithstanding that she had fully paid off the Verizon Debt on or about September 20, 2021.

55.    Therefore, in an attempt to rectify and correct the inaccurate credit reporting, Plaintiff submitted a written dispute by means of Experian's online web portal.  Upon information and belief, Plaintiff submitted at least two disputes my means of Experian's online web portal.

56.    Experian failed to correct its inaccurate reporting of the Verizon Account in response to Plaintiff's disputes.

57.    In a further attempt to rectify and correct the inaccurate credit reporting, Plaintiff emailed a dispute letter to Verizon on or about November 12, 2021. Attached to the email was a copy of financial records evidencing Plaintiff's full and complete payment of the Verizon Debt.

58.    Plaintiff further reviewed her consumer reports on or about November 16, 2021, which only confirmed that CRA Defendants were each still reporting the Verizon Account as a collections account with a current outstanding balance of $104.00 dollars.

59.    Plaintiff also began receiving letters from a collections company named McCarthy, Burgess & Wolff ("MBW").

60.    To confirm MBW's collection efforts was related to the Verizon Debt, on or about September 12, 2021, and September 13, 2021, Plaintiff requested validation of the MBW debt.

61.    MBW responses by letter dated November 24, 2021. In its letter, MBW confirmed that its collection efforts concerned the Verizon Debt.

62.    After Plaintiff's dispute letter to Verizon failed to clear up any confusion and failed to correct her inaccurate consumer reports, Plaintiff redirected her attention to the consumer reporting agencies themselves.

63.    Specifically, on or about December 9, 2021, Plaintiff submitted an additional dispute letter to each of the CRA Defendants (the "Dispute Letter(s)"). Each of the Dispute Letters was delivered to its intended recipient on or about December 23, 2021.

64.    Each Dispute Letter identified the Verizon Account and explained that Plaintiff had fully paid the Verizon Debt in July and September of 2021, and that Verizon's billing department had confirmed and verified that the account had been fully paid. The Dispute Letter further stated that the reporting of the Verizon Account was inaccurate, and, therefore, requested that such reporting be corrected.

65.    Enclosed with each Dispute Letter was a bank statement demonstrating that Plaintiff had fully paid the Verizon Debt, along with proof of address and identity.

66.    Equifax responded to Plaintiff's dispute letter by letter dated December 20, 2021. In its letter, Equifax indicated that the "results of the dispute" Plaintiff filed with Equifax "was complete."

67.    However, the same letter displayed Equifax's updated reporting of the Verizon Account which reflected no substantive revisions: Equifax was still reporting the Verizon Account

as having an active and outstanding balance of $104.00 dollars that was "Past Due," and indicated a "Date of First Delinquency" of October 2020.

68.    Equifax further responded to Plaintiff's dispute letter by letter dated December 30, 2021. In its letter, Equifax indicated that the "results of the dispute" Plaintiff filed with Equifax "was complete."

69.    However, the same letter displayed Equifax's updated reporting of the Verizon Account which reflected no substantive revisions: Equifax was still reporting the Verizon Account as having an active and outstanding balance of $104.00 dollars that was "Past Due," and indicated a "Date of First Delinquency" of October 2020.

70.    TransUnion responded to Plaintiff's Dispute Letter by letter dated January 6, 2022. In its letter, TransUnion indicated that its "investigation of the dispute" was "now complete."

71.    However, the same letter displayed TransUnion's updated reporting of the Verizon Account which reflected no substantive revisions: TransUnion was still reporting the Verizon Account as having an active and outstanding balance of $104.00 dollars that was "Past Due," with a "Pay Status" of "In Collection."

72.    Needless to say, Plaintiff had already fully paid off her Verizon Debt and it was inaccurate to report that Plaintiff owed a Verizon balance at all, and such balance was certainly not "Past Due."

73.    Upon information and belief, Experian has yet to respond to Plaintiff's Dispute Letter.

74.    Plaintiff again reviewed her consumer reports provided by each of CRA Defendants on or about January 23, 2022, in the hope that CRA Defendants had by then corrected their

respective inaccurate consumer reports.  However, upon reviewing the consumer reports, Plaintiff was quickly disabused of that notion as she became aware that her efforts had been in vain.

75.     Specifically, TransUnion's consumer report concerning Plaintiff dated January 23, 2022 reported the Verizon Account as having an active and outstanding balance of $104.00 dollars that was "Past Due," with a "Pay Status" of "Collection."

76.     Equifax's consumer report concerning Plaintiff dated January 23, 2022 reported the Verizon Account as having an active and outstanding balance of $104.00 dollars that was "Past Due," and "Account Status" of "COLLECTION," and a "Payment History" grid indicating a "C" notation for the months of November 2021 and December 2021.

77.     Experian's consumer report concerning Plaintiff, dated January 23, 2022, reported the Verizon Account as having an active and outstanding balance of $104.00 dollars, a "Status" indicating "Collection account. $104 past due as of Jan. 2022," and a "Payment History" grid indicating a "C" notation for the months of July 2021 and January 2022.

78.     It is inaccurate and materially misleading to report an account that had been fully paid off in July 2021 as having either (i) an outstanding balance, (ii) an outstanding balance that is "past due," (iii) a current account status of "collections," or (iv) any notation indicating the account is in collections, *for any month subsequent to the month in which the account was fully paid off*.

79.     Moreover, it is inaccurate and materially misleading to report the Verizon Account as in collections at all, or in any way delinquent or derogatory, because Plaintiff had fully and completely paid off the Verizon Debt in or around February 2021, and again in March 2021, and

only Verizon's refusal to cancel Plaintiff's subscription resulted in the Verizon Account ostensibly sustain a balance that became "past due" and then charged off and sent to collections.

80.     Upon information and belief, each CRA Defendant forwarded Plaintiff's Dispute Letter to the furnisher, Verizon, in or around November 2021.

81.     Upon information and belief, Verizon was notified of each of Plaintiff's Dispute Letters.

82.     Upon information and belief, Verizon failed to conduct a reasonable investigation in response to each of Plaintiff's Dispute Letters.

83.     Upon information and belief, Verizon failed to forward the results of one or more of its dispute investigations to each of the consumer reporting agencies that received inaccurate information about Plaintiff and the Verizon Account.

84.     As a direct result of Verizon's failure to reasonably investigate the disputed information and report the results to each CRA Defendant, respectively, the inaccurate Verizon Account information remained on Plaintiff's respective consumer reports.

85.     Upon information and belief, each CRA Defendant and Verizon continue to inaccurately report the Verizon Account on consumer reports concerning Plaintiff.

**D.  Plaintiff Suffered Further Damages**

86.     As a direct result of the Defendants' inaccurate reporting, Plaintiff suffered and suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

87.     Upon information and belief, Defendants' inaccurate reporting caused Plaintiff's credit score to be significantly reduced to a number approximating 670.

88.     The reduction in Plaintiff's credit score caused Plaintiff to refrain from applying for refinancing of a car loan, or other related relief, that Plaintiff needed for reasons more fully described hereinabove.

89.     Further, Natalie had been wanting to orchestrate a long-overdue family vacation for months, but was inhibited by the steep financial cost a family vacation was bound to incur.

90.     While exploring vacation options on Travelocity.com, an online travel and vacation agency, Natalie was made aware that Affirm, Inc. ("Affirm"), a lender that offers to finance a vacation upfront in return for repayment with interest in monthly installments, may finance her vacation.

91.     To that end, Natalie submitted an application to Affirm.

92.     Upon information and belief, Affirm reviewed an Experian consumer report and Experian-provided credit score concerning Natalie and, based on that credit information, issued a partial denial. The partial denial indicated that Natalie would need to pay nearly half of the loan amount up front, along with a high interest rate on the remainder.

93.     The Affirm loan terms that were the result of Affirm's partial denial rendered the vacation unaffordable for Natalie and her family, and she did not book a vacation.

94.     Natalie tried more than once. As recently as on or about February 10, 2022, Natalie applied to Affirm once again for a vacation loan. The Affirm loan was to be issued by, and in partnership with, Cross River Bank.

95.     In response, Natalie received a letter from Affirm, dated February 11, 2022, in which Affirm partially denied her application for a loan (the "Affirm Denial").

96.     The Affirm Denial explained that the denial was based on a credit score and "information obtained from" Experian. Further, the Affirm Denial explicated that the first of several "[k]ey factors that adversely affected [Natalie's] credit score" was a "SERIOUS DELINQUANCY."

97.     Upon information and belief, the Verizon Account is the only serious delinquency existing on Natalie's consumer reports or credit profile.

98.     Therefore, Defendants' misreporting directly caused Natalie to be denied a vacation loan by Affirm.

99.     The Affirm loan terms that were the result of Affirm's partial denial rendered the vacation unaffordable for Natalie and her family, and she did not book a vacation.

100.    Without the Affirm loan, Natalie was financially unable to book a vacation, and so she did not, and still has not, gone on a long-overdue vacation with her family.

101.    As a direct result of Defendants' inaccurate reporting, Plaintiff fears that she will be unable to qualify for credit cards and other credit opportunities.

102.    Moreover, Plaintiff fears that, as a worker for a federal government agency, her reduced credit score may negatively impact her current job, and future job opportunities and prospects.

103.    The reduction in Plaintiff's credit score and credit standing caused by Defendants worries Plaintiff greatly, and has caused, and continued to cause, Plaintiff to experience anxiety, distress, anger, extreme frustration, and sleepless nights.

104.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, humiliation, stress, anger,

sleepless nights, reputational damage, frustration, shock, embarrassment, and violation of Plaintiff's right to privacy, and anxiety.

## CAUSES OF ACTION

### COUNT I

### Against CRA Defendants for Violating 15 U.S.C. §1681e(b)

105.   Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

106.   The FCRA imposes a duty on credit reporting agencies to devise and implement procedures to assure the "maximum possible accuracy" of credit reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

107.   CRA Defendants each failed to follow reasonable procedures to ensure maximum possible accuracy of the information reported on Plaintiff's consumer reports.

108.   CRA Defendants each violated 15 U.S.C. §1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports and credit files it published and maintained concerning Plaintiff.

109.   As a result of each of CRA Defendants' statutory violations, Plaintiff suffered actual damages as described hereinabove.

110.   Each of CRA Defendants' violations were willful, rendering each of CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

111.    In the alternative, each of CRA Defendants were negligent, which entitles the Plaintiff to recovery under 15 U.S.C. §1681o.

112.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT II

### Against CRA Defendants for Violating 15 U.S.C. §1681i

113.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was accurate and record the current status of the disputed information or delete the item from Plaintiff's consumer report and credit file.

114.    As more fully alleged hereinabove, Plaintiff repeatedly communicated to each of Equifax, TransUnion, and Experian that each was inaccurately reporting the Verizon Account, and repeatedly explained why and how such reporting was inaccurate.

115.    Nevertheless, Equifax, TransUnion, and Experian each continued, and continue, to report and publish the inaccurate credit information.

116.    Upon information and belief, Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(2)(A) by failing to provide Verizon with all of the relevant information regarding Plaintiff and his dispute.

117.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit file or correct the inaccurate information upon reinvestigation.

118.     Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(6)(A)-(B) by failing to provide to Plaintiff "written notice . . . of the results of a reinvestigation," a consumer report revised pursuant to the results of the reinvestigation, and other requisite notifications required by 15 U.S.C. §1681i(a)(6)(A)-(B).

119.     As a result of each of Equifax, TransUnion, and Experian' respective statutory violations, Plaintiff suffered actual damages as described hereinabove.

120.     Each of Equifax, TransUnion, and Experian respective violations were willful, rendering Equifax, TransUnion, and Experian each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

121.     In the alternative, each of Equifax, TransUnion, and Experian was negligent, which entitles the Plaintiff to recovery under 15 U.S.C. §1681o.

122.     Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from each of Equifax, TransUnion, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

### COUNT III

### Against Verizon for Violating 15 U.S.C. §1681s-2(b)

123.     Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

124.     After a consumer submits a dispute to a consumer reporting agency, such consumer reporting agency is required to notify the furnisher of the disputed information of the dispute.

125.     Therefore, each time Plaintiff submitted a dispute to any credit bureau, each credit bureau, in turn and as required by federal statute, notified Verizon of Plaintiff's dispute.

126.     Upon receiving notice of a dispute from a credit reporting agency, furnishers are required to conduct an investigation and correct the misleading information as necessary, as follows:

> After receiving notice pursuant to 15 U.S.C. § 1681i(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall –
>
> (A)     conduct an investigation with respect to disputed information;
>
> (B)     review all relevant information provided by the consumer reporting agency pursuant to § 1681i(a)(2) of this title;
>
> (C)     report the results of the investigation to the consumer reporting agency; [and]
>
> (D)     if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information…

15 U.S.C. §1681s-2(b) (emphasis added).

127.     Verizon received notice of each of Plaintiff's disputes to each credit bureau, including Equifax, TransUnion, and Experian, and still failed to comply with its obligations under the FCRA.

128.     Verizon failed to conduct a timely and reasonable investigation of Plaintiff's dispute after receiving notice thereof from each credit bureau, including Equifax, TransUnion, and Experian.

129.     Verizon willfully, intentionally, recklessly, and/or negligently continued to report inaccurate information to credit bureaus, including CRA Defendants.

130.     Instead of removing the inaccurate information, Verizon improperly verified that the reporting was accurate.

131.    Worse still, even *after Verizon admitted to Plaintiff that the Verizon Debt was paid off*, Verizon willfully, intentionally, recklessly, and/or negligently continued to furnish inaccurate Verizon Account information to the credit bureaus, including CRA Defendants, on, upon information and belief, *at least six occasions*, between the months of August 2021 and January 2022, and still ongoing.

132.    Upon information and belief, Verizon is continuing to furnish such inaccurate information, despite repeatedly admitting to Plaintiff that such reporting was inaccurate.

133.    As a result of Verizon's misconduct, Plaintiff has suffered actual damages as described herein.

134.    Verizon's misconduct was a direct and proximate cause of Plaintiff's damages.

135.    As a result of Verizon's statutory violations, Plaintiff suffered statutory and actual damages as described herein and is entitled to recover statutory, actual, and punitive damages under 15 U.S.C. §1681n and §1681o.

### JURY DEMAND

Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a)    Declaratory judgment that Defendants violated 15 U.S.C. §1681e(b);

(b)    An award of actual damages pursuant to 15 U.S.C. §§1681n(a)(1) or 1681o(a)(1);

(c)    An award of statutory damages pursuant to 15 U.S.C. §§1681n(a)(1) and1681o(a)(1);

(d)      An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. §1681n(a)(2),

(e)      Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and §1681o(a)(2); and

(f)      Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

DATED: February 25, 2022                    **THE CONSUMER JUSTICE LAW FIRM**
                                            ATTORNEY

                                            By:/s/ *Alla Gulchina*
                                            Alla Gulchina, PA Bar No. 307014
                                            The Consumer Justice Law Firm
                                            86 Hudson Street
                                            Hoboken, NJ 07030
                                            T: (480) 626-1333
                                            F: (718) 715-1750
                                            E: agulchina@cjl.law